IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION



F I L E D
FEB 2 4 2011
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES ex rel. GREGG JONES, BASSEM AWAD AND PAUL FUNK, | Case No. 1:09-cv-1098 TSE |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| | ~~FILED UNDER SEAL~~ |
| L-3 COMMUNICATIONS CORPORATION, | pursuant to 31 U.S.C § 3730(b)(2) |
| | Unsealed per Order of 2/25/2011 |
| Defendant. | |

### FIRST AMENDED COMPLAINT

Qui Tam Relators Gregg Jones, Bassem Awad, and Paul Funk ("Relators" or "Mr. Jones," "Mr. Awad," and "Mr. Funk") bring this First Amended Complaint in the name of the United States Government for false claims that were submitted or caused to be submitted to the United States Government by Defendant L-3 Communications Corporation and its predecessor-in-interest, Titan Corporation, as follows:

### I.   INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America ("United States") arising from false statements and claims made and presented by the Defendant, L-3 Communications Corporation, its predecessor-in-interest, Titan Corporation, its agents, employees, and/or co-conspirators ("L-3/Titan" or "Defendant") in violation of the Federal Civil False Claims Act, 31 U.S.C.§§ 3729 et seq., as amended ("the Act"). The violations consist of fraudulent misrepresentations relating to the services performed under a contract with the United States.

2. The Act provides that any person who knowingly submits or causes to be

submitted a false or fraudulent claim to the United States for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the United States. Liability attaches both when a defendant knowingly seeks payment that is unwarranted from the United States and when material false records or statements are knowingly created or caused to be used to conceal, avoid or decrease an obligation to pay or transmit money to the United States. The Act allows any person having information regarding a false or fraudulent claim against the United States to bring an action for himself ("Relator(s)") and for the United States and to share in any recovery.

3. Based on those provisions, Relators Gregg Jones, Bassem Awad, and Paul Funk seek to recover damages and civil penalties arising from Defendant L-3/Titan's presentation of false records, claims, and statements to the United States and its agents in connection with claims for payment for services required to be performed under contracts with the United States military (Contract No. W911W4-04-D-0005 and its predecessor Contract No. DASC01-99-D-001). L-3/Titan fraudulently presented claims to the United States and received payment therefrom for linguist services that were not rendered in accordance with the contracts in order to illegally maximize profits at the Government's expense.

4. More specifically, the Relators' claims involve L-3/Titan's blatant failure to test the proficiency of linguists it hired from the local population to assist United States military personnel (referred to herein as "local CAT I linguists").

5. Instead, L-3/Titan supplied the U.S. military with hundreds, if not thousands, of unqualified local CAT I "linguists" who were, in many cases, so useless at interpreting or translating that military personnel used them for armed guards or menial labor.

6. Despite Defendant's failure to fulfill the terms of its contracts, L-3/Titan billed the U.S. Government and was paid as if it had supplied qualified local CAT I linguists.

7. L-3/Titan's blatant disregard of its contractual obligations not only bilked the U.S. treasury, but also compromised the safety of U.S. troops and operations.

## II. JURISDICTION AND VENUE

8. The Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

9. The Court has personal jurisdiction over the Defendant, L-3/Titan, pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because L-3/Titan can be found, transacts business, and presented the actionable false claims to the United States in the Eastern District of Virginia.

10. Venue is proper in the Eastern District of Virginia pursuant to 31 U.S.C. § 3732(a) because L-3/Titan can be found, transacts business, and presented the actionable false claims to the United States in the Eastern District of Virginia.

11. In accordance with 31 U.S.C. § 3730(b)(2), this First Amended Complaint has been filed under seal and will remain under seal for a period of at least 60 days from its filing date, and shall not be served upon the Defendant until after the Court so orders.

## III. PARTIES

12. Relator Gregg Jones is a United States citizen and currently resides in Virginia. Mr. Jones has more than nine years' experience working with Department of Defense contracts in the Mideast. He worked for Titan's predecessor-in-interest, and then for Titan and eventually L-3 after it purchased Titan. From December 2003 to August 2006, he worked as a Site Manager for L-3/Titan on the Contracts relevant to this Complaint, first in Mosul, Iraq (from December 2003 to September 2004), and then in Qatar (from September 2004 to August 2006).

13. Relator Bassem Awad is a United States citizen and currently resides in Michigan. From July 2003 to 2004, Mr. Awad was a Linguist for Northrop Grumman's

subsidiary Vinnell Corporation, supporting Vinnell personnel and Coalition Military Advisory Training Team forces, who were training the new Iraqi Army by providing translation services. From 2006 to 2007, Mr. Awad was employed by L-3 as the Regional Recruiting Manager in Dearborn, Michigan. From August 2007 to March 2008, Mr. Awad served as L-3's Iraq Local National Recruiting Manager, supervising L-3's linguist recruiting operations for the Central and South regions of Iraq.

14. Relator Paul Funk, a resident of Reston, Virginia, has had a long and distinguished career managing and directing linguistic training programs for United States military contractors. Most pertinently, from 2002 until 2006, Mr. Funk was employed by Northrop Grumman as a Site Support Manager, responsible for the sourcing, testing, hiring, and training of secret and top secret linguists for all overseas missions. In 2007, Mr. Funk was a Regional Manager for Aegis MEP in Afghanistan, the second highest position in the country working on the transitioning of the relevant Contracts from L-3 to Aegis MEP after L-3 lost its bid to continue providing linguists to support U.S. forces. During his tenure with Northrop Grumman and MEP, Mr. Funk was sent to the Middle East and Afghanistan on a total of five occasions to inspect L-3/Titan's performance under the relevant Contracts.

15. Relators Jones, Awad, and Funk are the original source, as required and defined under 31 U.S.C. § 3730(e)(4)(A)-(B), of the disclosure of the fraudulent claims submitted by and payments received by L-3/Titan as described herein.

16. Defendant L-3 Communications Corporation ("L-3") has Virginia headquarters at 1900 Campus Commons Drive, 6th Floor, Reston, VA 20192. According to L-3's website, it is "a prime contractor in Command, Control and Communications, Intelligence, Surveillance and Reconnaissance (C³ISR), [and] Government Services." Further, the company states that since

4

1999, its Linguist Operation and Technical Support division "has been the premier provider of language support services for the U.S Department of Defense."

## IV. FACTS

17. In approximately 2005, L-3 acquired Titan and assumed Titan's obligations under Contract No. W911W4-04-D-005 ("the 2004 Contract"), a contract awarded by the United States Government to Titan to provide linguist services to the U.S. Army in support of "Operation Enduring Freedom" in Iraq and Afghanistan and U.S. Central Command Persian Gulf Area of Operations. The 2004 Contract is the extension of a long-running contract for linguist services in the Persian Gulf area. The original contract, No. DASC01-99-D-001 ("the 1999 Contract"), was awarded in 1999 to BTG Incorporated. Titan acquired BTG and assumed its obligations under the 1999 Contract in 2001.

18. L-3/Titan's obligations to supply linguists to the U.S. Government were governed both by the 1999 and 2004 Contracts, the Performance Based Work Statement ("PBWS") that was part of each Contract, and by the task orders issued pursuant to the Contracts. Collectively, these documents are referred to as "the Linguist Contract."

### A. L-3/Titan's Obligations under the Linguist Contract

19. Under the Linguist Contract, which extended until at least 2008, L-3 was required to supply linguists in three categories, with "Category one [CAT I] contract linguists" defined as "native linguists locally hired in the AO [area of operation]."[1]

---

[1] Relators' claims relate only to Category One Contract Linguists hired locally, referred to herein as "local CAT I linguists." Relators' claims do not relate to any other category of linguists supplied under the Linguist Contract.

5

20. Further, the Linguist Contract required L-3/Titan to "evaluate its linguists prior to deployment and certify to the Government that the Contract linguists possess the requisite proficiency levels in both the foreign language for which they are being hired and English."

21. The Linguist Contract required that applicants be pre-screened for general skills and linguist category skills.

22. The Linguist Contract required that the results of the pre-screening be fully documented.

23. Under the Linguist Contract, CAT I linguists were to have the following skills:

   (a) Ability to write and speak in clear and concise grammar and punctuation of the required native language;

   (b) Capable of providing idiomatic translation of non-technical material using correct syntax and expression from English to the native language or vice versa;

   (c) Ability to conduct consecutive, accurate translations/interpretation of on-going conversation/activities.

24. CAT I linguist proficiency requirements were defined by the Interagency Language Roundtable ("ILR") language skills scale in the Linguist Contract. CAT I linguists were required to "have native proficiency in the target language (level 4 to 5 as defined by the Interagency Language Roundtable (ILR)), and an advanced working proficiency (ILR level 2+) in English."

25. The PBWS also made clear that L-3/Titan was not in compliance with the Linguist Contract unless 98% of the local CAT I linguists it supplied to the military had been fully pre-screened and met the required ILR proficiency requirements.

26. In order to adequately determine whether a CAT I linguist applicant met the required levels of proficiency, four tests had to be given:

6

(a) interpreting spoken English to the target language;

(b) interpreting the spoken target language to English;

(c) translating written English to the target language; and

(d) translating the written target language to English.

These tests had to be conducted by "a staff member fluent in the target language and English."

27. The Linguist Contract further required the contractor to "implement a complete quality control program that identifies potential and actual problem areas in providing requirements of the contract ... and the results of corrective actions taken throughout the life of the contract."

### B. L-3/Titan Failed to Meet CAT I Linguist Proficiency and Testing Requirements

28. Collectively, Relators observed operations and/or worked under the Linguist Contract in multiple locations across Iraq and in Qatar, Kuwait, and Afghanistan from 2003 until 2007.

29. Instead of adequately testing CAT I linguists to ensure that it was supplying local CAT I linguists with the requisite ILR proficiency, as required by the Linguist Contract, from at least 2003 to 2008, L-3/Titan did not conduct any meaningful testing of applicants in either English or the target language.

30. In most cases, local CAT I linguists were hired based solely on a two-minute conversation with an L-3/Titan employee who was not qualified under the Linguist Contract to administer any of the necessary tests to determine the applicant's ILR proficiency level.

31. For example, in Mosul between December 2003 and September 2004, no written tests of any kind were given, and the oral "testing" consisted solely of a brief, one-on-one interview between the applicant and a Third Country National ("TCN") who was a CAT I

7

linguist. The TCN would have a cup of tea and chat briefly with the applicant, deciding whether the applicant was "qualified" to be hired, largely based on whether she liked the applicant. There was no testing or documentation of the local CAT I linguists' ILR proficiency level in either English or the target language.

32. At L-3/Titan's Green Zone testing site, local CAT I linguists were given written exams to test their basic understanding of English – these were not tests meant to test the ILR standards required by the Linguist Contract.

33. Professional standards require measures be taken to prevent cheating on exams, but at L-3/Titan's Green Zone facility, the tests were left out in the open in the testing area, and the proctors moved in and out of the room, allowing applicants to cheat by openly exchanging information with each other.

34. Further, test administrators were not fluent in both English and the target language and, thus, they were not qualified to administer the tests necessary to determine the applicants' ILR proficiency in both languages.

35. Relator Mr. Funk was told by employees in charge of testing in L-3/Titan's Balad/Anaconda and Bagram facilities that they had never even heard of the ILR proficiency standards, let alone the requirements that linguists be tested in both English and the target language, and test results be documented in L-3/Titan's records.

36. L-3/Titan did not document that it performed the required pre-screening for any of the local CAT I linguists it hired, at least during the period 2003 to 2008, and, likely, before and after that time.

37. As explained above, L-3/Titan ignored its obligation under the Linguist Contract to test the ILR proficiency levels of local CAT I linguists, and instead supplied the U.S. military with poorly skilled CAT I linguists.

### C. L-3/Titan Knew It Was Providing Deficient CAT I Linguist Services and Not Adequately Testing CAT I Linguist Applicants

38. L-3/Titan knowingly and systematically defrauded the United States by either explicitly or implicitly certifying to the Contracting Authority that it had complied with the material provisions of the Linguist Contract requiring quality control when, in fact, it had not so complied.

39. L-3/Titan knew that its testing procedures were inadequate and in May 2004 L-3/Titan had indicated in an email that it would "start conduct [sic] testing language procedures and will discuss a proposal for Site Manager and Staff training" for its Mosul location.

40. If adequate testing had been taking place at Titan's facilities in Iraq, there would have been no need to "start" conducting language testing procedures in May 2004, let alone to train Site Managers and staff regarding it. These language testing procedures for Mosul, however, did not go into effect at least until after September 2004, if ever.

41. Relator Awad repeatedly voiced concern to his L-3 superiors that unqualified applicants were being hired as local CAT I linguists. These complaints were not just ignored, but L-3's management, including Vice President Clyde Slick, responded to these reports by stating that recruiting numbers had to stay up at all costs to maximize profits.

42. The validity of Relators' concerns about the lack of testing for local CAT I linguists is borne out by L-3's own information. L-3/Titan kept several databases to keep track of test scores, or the lack thereof, for local Cat I linguists. The "IZ Central Written Test Tracker" is an Excel spreadsheet database that shows local CAT I linguists hired by L-3, and which of

9

them had failed the written and/or oral testing, organized by the various testing centers. This database does not include candidates, just local CAT I's hired by L-3. For all but a few employees, the test results and scores are absent from the database, and when present, the scores are below that required by the Linguist Contract: the scores should be 2+ or above, but most of the scores that are listed are 0's or 1's.

43. Another Excel spreadsheet maintained by L-3 entitled "LNL Language Test Tracker 23Feb 08" tracks by region the local CAT I linguists who failed the required oral and/or written tests. The database shows that test results and scores are missing for most local CAT I linguists.

44. The "24 Hour WLSE Report" is an Excel database compiled by L-3 personnel to track the local CAT I linguists who were to be retested. The report makes clear that at least as of February 3, 2008, some local CAT I linguists had been hired despite having failed either the oral or written tests, or both. Notably, the ILR level of any local CAT I linguists is not documented, as required to be in compliance with the terms of the Linguist Contract.

45. L-3/Titan did not implement *any* process or procedure to ensure that local CAT I linguists had the specified ILR proficiency requirements in both the target language and English. L-3 did not test for ILR proficiency levels, nor did it document them.

46. Further, L-3/Titan implemented no procedure to ensure that local CAT I linguists who failed the rudimentary and inadequate tests that were given in one locale were not hired at another locale within the country.

47. And although it was required by the Linguist Contract, L-3/Titan knowingly failed to implement a quality control program to evaluate the provision of local CAT I linguist services.

10

48. Simply put, far fewer than 98% of the local CAT I linguists supplied by L-3/Titan met the Linguistic Category skills required by the Linguist Contract. Thus, L-3/Titan operated far below the acceptable quality level of the Linguist Contract, but nonetheless billed the Government as if it had satisfied essential contract requirements.

### D. L-3/Titan's Actions Undermined U.S. Military Operations and Resulted in the Government Paying Hundreds of Millions of Dollars Based on False Claims Knowingly Submitted and/or Caused to be Submitted by the Defendant

49. L-3/Titan's deficiency in fulfilling the requirements of the Linguist Contract undermined U.S. military operations.

50. Relator Mr. Jones heard of hundreds of incidents where inadequate interpretations led to problems between U.S. forces and local non-English speakers.

51. One common example of how L-3/Titan's failure to provide properly skilled local CAT I linguists caused difficulties to U.S. troops was that military personnel and Iraqis were not able to clearly communicate about when and where meetings were supposed to be, so that the Americans and Iraqis would not show up at the same time and place.

52. From 2003 until 2008, there were approximately 3,000 local CAT I linguists in Afghanistan; 5,000-6,000 in Iraq; and 100-300 in Qatar.

53. Despite the fact that L-3/Titan had not—and could not—document that *any of* these local CAT I linguists met the required proficiency levels, L-3/Titan knowingly presented or caused to be presented to the United States claims for payment for the linguists' services and received payment therefore.

54. L-3 was paid under the Linguist Contract on a "cost plus fixed fee" basis, which generally results in a payment to the contractor of 2-1/2 times the contractor's costs; in this case, the costs include the salaries L-3 paid the linguists.

55. Given that each local CAT I linguist was paid approximately $12,000-15,000 annually, L-3/Titan's fraudulent billing of the United States was substantial, approximating as much as $250-300 million per year.

## COUNT ONE
### (False Claims Act – Presentation of False Claims)
### [31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009]

56. Relators incorporate by reference the allegations made in the preceding paragraphs of this First Amended Complaint as though set forth herein in full.

57. Through the acts described above, L-3/Titan and its agents and employees knowingly presented and caused to be presented a false and/or fraudulent claim for payment or approval to the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).

## COUNT TWO
### (False Claims Act – Making or Using False Record or Statement to Cause Claim to be Paid)
### [31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009]

58. Relators incorporate by reference the allegations made in the preceding paragraphs of this First Amended Complaint as though set forth herein in full.

59. Through the acts described above and otherwise, L-3/Titan and its agents and employees knowingly made, used, and/or caused to be made or used false records and statements material to such false and fraudulent claims in violation of 31 U.S.C. §§ 3729(a)(1)(B).

## COUNT THREE
### (False Claims Act – Making or Using False Record or Statement to Conceal, Avoid and/or Decrease Obligation to Repay Money)
### [31 U.S.C. § 3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009]

60. Relators incorporate by reference the allegations made in the preceding paragraphs of this First Amended Complaint as though set forth herein in full.

61. Through the acts described above, in violation of 31 U.S.C. § 3729(a)(1)(G), L-3/Titan and its agents and employees knowingly made, used, and/or caused to be made or used false records and statements material to L-3/Titan's obligation to pay or transmit money to the United States Government that L-3/Titan improperly and/or fraudulently received.

62. L-3/Titan also knowingly and improperly failed to disclose material facts that would have resulted in substantial repayments to the United States.

## COUNT FOUR
### (False Claims Act – Conspiracy)
### [31 U.S.C. § 3729(a)(3), 31 U.S.C. § 3729(a)(1)(C) as amended in 2009]

63. Relators incorporate by reference the allegations made in the preceding paragraphs of this First Amended Complaint as though set forth herein in full.

64. Through the acts described above and otherwise, L-3/Titan conspired to defraud the United States in violation of 31 U.S.C. § 3729(a)(1)(C). L-3/Titan also conspired to omit disclosing or to actively conceal facts which, if known, would have reduced Government obligations to it or resulted in repayments from it to Government programs.

65. L-3/Titan, its agents, and its employees have taken substantial steps in furtherance of those conspiracies, *inter alia*, by preparing false records, by submitting claims for reimbursement to the Government for payment or approval, and by directing its agents and personnel not to disclose and/or to conceal its fraudulent practices.

66. The United States, unaware of L-3/Titan's conspiracy or the falsity of the records, statements and claims made by L-3/Titan, its agents, and employees, and as a result thereof, has paid and continue to pay millions of dollars that it would not otherwise have paid.

67. Furthermore, because of the false records, statements, claims, and omissions by L-3/Titan and its agents and employees, the United States has not recovered federal funds from the Defendants that otherwise would have been recovered.

## COUNT FIVE
### (False Claims Act Retaliation Violation – Gregg Jones)
### [31 U.S.C. § 3730(h)]

68. Relators incorporate by reference the allegations made in the preceding paragraphs of this First Amended Complaint as though set forth herein in full.

69. Defendant has a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section and federal investigations.

70. While working as Site Manager for L-3/Titan in Mosul, Iraq, Relator Jones followed L-3/Titans' mandatory process for reporting unethical and fraudulent actions, and reported to L-3's Program Manager for Iraq that the company had not been paying local CAT I linguists in his area for two months.

71. Less than one day later, Relator Jones was terminated by L-3/Titan Regional Manager David Winkler, who told Relator to "[p]ack your bags, you are fired."

72. Before Relator Jones left Mosul, L-3/Titan's Human Resources Department reinstated him via email because Winkler did not follow proper procedures for his termination.

73. Within three days of the termination, L-3/Titan decided to send Relator Jones to work for the company in Qatar. While there, Relator Jones was forced to work longer hours, essentially working all hours of the day and night, seven days a week. During the two years

14

Relator Jones worked under these conditions in Qatar, he was paid approximately $10,000 per year less than he had been paid when he worked in Iraq.

74. Relator's transfer to a lower-paying position was done in retaliation by Defendant L-3/Titan against Relator for reporting that the company was fraudulently withholding Government funds that were supposed to be used to pay local employees in Iraq.

75. Defendant knew or should have known that Relator Jones's activities in investigating and opposing its unlawful conduct, including his investigation for, initiation of, testimony for, or assistance in an action filed under this section, were in connection with this False Claims Act action.

76. The actions of Defendant damaged and continue to damage Relator Jones in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

### COUNT SIX
### (False Claims Act Retaliation Violation – Bassem Awad)
### [31 U.S.C. § 3730(h)]

77. Relators incorporate by reference the allegations made in the preceding paragraphs of this First Amended Complaint as though set forth herein in full.

78. Defendant has a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section and federal investigations.

79. While working for L-3/Titan in Michigan, Relator Awad's duties included arranging advertising contracts between L-3 and a local Arabic television station related to L-3's recruitment of linguist candidates. During the course of performing those duties, Relator Awad

witnessed L-3/Titan's Director of Recruiting ("the Director") arrange to solicit kickbacks from the station and take favors, such as the visit of a prostitute, from the station's owner.

80. Shortly thereafter, the Director took away Relator's responsibility for advertising with the station and assigned Relator to Iraq to run the local linguist program. Relator reported the conduct of the Director of Recruiting to an L-3 Vice President before leaving for Iraq. After Relator began working in Iraq, The station's owner was made a subcontractor to L-3/Titan.

81. Almost immediately upon arriving in Iraq, Relator Awad saw inappropriate and unethical conduct on the part of L-3 supervisors and employees in the hiring of local CAT I linguists, and began complaining about it. For example, Relator complained that instead of being hired based on test scores, local CAT I linguists were hired because they were having sex with L-3 employees or because they had a connection to L-3's Director of Recruiting. These linguists were then used for personal services for L-3 employees, not as linguists under the Linguist Contract. Relator's immediate supervisor, among several people, told Relator that other managers wanted to terminate his employment because of his complaints.

82. Relator Awad was subject to unnecessary discipline and eventually terminated for opposing activity that violated the False Claims Act. Any "legitimate, non-discriminatory" reason the company may have had for terminating Relator is pretextual.

83. Upon information and belief, Relator alleges that L-3 has impeded his ability to obtain other employment, in further retaliation for his reporting of L-3's unethical and fraudulent conduct.

84. Relator's transfer and termination were done in retaliation by Defendant L-3/Titan against Relator for reporting fraudulent and unethical conduct by L-3 supervisors and employees.

85. Defendant knew or should have known that Relator Awad's activities investigating and opposing its unlawful conduct, including his investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, were in connection with this False Claims Act action.

86. The actions of Defendant damaged and continue to damage Relator Awad in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators Jones, Awad, and Funk request that judgment be entered against Defendant L-3 Communications Corporation ordering that:

1. Defendant cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

2. The Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's actions, as well as a civil penalty against Defendant of not less than $5,500 and not more than $11,000, for each violation of 31 U.S.C. § 3729;

3. Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal Civil False Claims Act;

4. Relators be awarded all costs and expenses of this action, including attorneys' fees, pursuant to 31 U.S.C. § 3730(d);

5. Damages be awarded for loss of pay, including two times the amount of back pay, interest on back pay, and compensation for any special damages, as a result of retaliation in violation of 31 U.S.C. § 3730(h) of the False Claims Act;

6. Relators be awarded all costs and expenses related to bringing their retaliation

claims, including attorneys' fees;

7. Defendant be enjoined from concealing, removing, encumbering or disposing of assets that may be required to pay the civil monetary penalties imposed by the Court;

8. Defendant disgorge all sums by which it has been enriched unjustly by its wrongful conduct; and

9. The United States and Relators recover all such other relief as the Court deems just and proper.

Dated: February 15, 2011

Respectfully submitted,

By: _____
Mark Hanna
Virginia Bar Number 45442
Michelle Woolley
MURPHY ANDERSON PLLC
1701 K St. NW, Suite 210
Washington, DC 20006
Phone: 202-223-2620  Fax: 202-223-8651
mhanna@murphypllc.com
mwoolley@murphypllc.com
*Counsel for Relator*

Scott Newar
700 Louisiana, 25th Floor
Houston, Texas 77002
Phone: 713- 220-9155 Fax: 713- 223-9319
newar@newarlaw.com
*Counsel for Relator*
*Pro hac vice forthcoming*

Ann Lugbill
MURPHY ANDERSON PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: 513-784-1280  Fax: 877-784-1449
alugbill@murphypllc.com
*Counsel for Relator*
*Pro hac vice forthcoming*